May it please the court. When a plaintiff goes to trial against a defendant, the plaintiff bears the burden of proving real, recoverable damages, and if the issue is raised, the plaintiff also bears the burden of proving personal jurisdiction's minimum contacts. And this plaintiff or their counsel doesn't show up at the trial to provide active opposition. And so while this case arises in a novel procedural posture, to be sure, the controlling legal rules are rather orthodox. The plaintiff didn't prove the minimum contacts of jurisdiction, and the plaintiff didn't prove the lion's share of this damages award. And so with the panel's indulgence, I'd like to focus most of my time on the damages question, but I recognize that it's a close question on the merits. I don't think we have a slam-dunk argument. I don't think they do either. We do submit that the Moncrief decision from this circuit and the Walden decision compel a reversal. What I'd like to focus on about jurisdiction today is the waiver point. I'd like to give the court one additional record citation to, I think, put the nail in the coffin of this idea that the question of jurisdiction was waived or that there's been sandbagging. Now, we've given you already the arguments about Rule 12, which says that the issue of personal jurisdiction can be raised in a motion to dismiss or an answer, which all of the defendants did here. We've also given you the precedent saying that when a motion to dismiss is denied, that doesn't take personal jurisdiction out of the case. And we've given you the Bayou Steel Rule, which says that if you assert a counterclaim, that, too, doesn't take personal jurisdiction off the case. The citation I want to give you pertains to the sandbagging idea, because the plaintiff has taken the position that they didn't prove personal jurisdiction's minimum contacts because they were somehow tricked into thinking it was off the table. But if you look in the record at page 408, what you'll see is the plaintiff's response to the motion to dismiss. And at 408, the plaintiffs tell the court, you should deny the motion to dismiss because the facts about personal jurisdiction are intertwined with the merits. And what they say on 408 is that the jurisdictional issues should be referred to the merits. And so one way to solve this question is to look at what we filed with the court, because we consistently denied personal jurisdiction throughout. But you can also see that the plaintiff themself asked the court to put jurisdiction into the trial. And so that, we think, puts really the nail in the coffin of this idea that jurisdiction is somehow waived. Now, the merits, I know, are going to require a close reading of the court's precedents. There are a lot. And so I think the better use of the court's time today is to turn to the damages issue. I think we can add more value to the case in that respect. Let me be as precise as I can about the relief that we're asking for. You have before you a judgment that awards both actual damage and loss of use damages. Now, we don't challenge the actual damages. Those account for the cost of replacing the equipment that didn't get returned. That also accounts for the cost of repairing damaged equipment and the invoices we didn't pay. We don't challenge that. That's about $53,000 of the award. Let me make sure I understand. Three pieces of equipment were returned. One was not. That's right. There are systems. So I think each system has a few pieces. But, yeah, we'll talk about four systems. Three were returned altogether. One wasn't returned. And I think one that was returned was damaged. So you have a little bit of each. But all of those damages, the replacement for the one that wasn't returned and the repair costs are accounted for in the $53,000 of actual damages. What we're challenging here is the court's imposition of the loss of use damages. That's apart from the actual damages I just described, and that amounts to $878,000. And the reason that that's reversible error is because neither of the causes of action that they try to found that on are valid. We have a fraud cause of action, but there's no proof of detrimental reliance. So there's no fraud whatsoever. And they also have a breach of contract cause of action. And that does give rise to the actual damages I just described, the $53,000. But that's all. There's no valid evidence of the loss of use damages here. And to be clear, we're not saying that in this kind of case, a failure to return property case, that the loss of use damages are never recoverable. We think they could be with the proper proof. They just aren't here. So let me focus on each version. Let's start with the fraud action. To prove the fraud cause of action, they needed to prove detrimental reliance. And remember, the misrepresentations we're talking about here aren't the representations that formed the original contract. It wasn't the representation, we will pay you in exchange for the property. It's the we're going to send your stuff back. That's right. After the breach. And so what they would need to prove is that they took some action in reliance on that statement. And you have two kinds of evidentiary problems with that. First of all, you have an absence of evidence. They put the gentleman on the stand, Mr. Pena. He's their operations manager who should have testified to this. And they just didn't ask him the question. They never asked him because of what they told you, what did you do differently or what would you have done? There are no questions like that. And the other problem is you have the only evidence about this goes in our favor. You don't think that's because the answer is obvious. If you tell me you're sending my stuff back, what I'm doing, I guess, is waiting on the carrier to show up with my stuff. That may well be your back. So that's what I'm doing. I'm waiting on you to send it like you said you would. That may get reliance, Your Honor, but it doesn't show any detriment. It doesn't show that you suffered any injury or harm because of the delay. If you didn't have plans for the equipment or didn't have to put it to any other use, it serves no detriment here. So that's a distinct element of the fraud cause of action. You need both reliance and detriment because of the reliance. What was the evidence testimony from where it was claimed that these could easily have been leased to other individuals? Sure. So in the record, that's on page 1165. There are exactly two questions and two answers, and I can read it to you now if the court will indulge me. The question is, all of this equipment was equipment which you could have leased had it been back in the United States. Is that correct? And the answer is yes. So he said it could have been leased. Is this the same witness you were talking about before? This is Mr. Pena. That's right. And so that's as far as it goes. It says it could have been leased. But the kind of questions and answers you don't get are the following. You don't get any questions about demand, which is to say that they had customers who wanted to rent this equipment, and you also don't get any questions about supply, which is to say that they didn't have other equipment in inventory to satisfy that demand. So if I can give the court a simple analogy that might be familiar. Imagine a rental car situation. If I rent a car for a week from Enterprise and I keep it a week too long, then the question under the common law is can they prove lost profits? Well, they can, but they have to prove that someone came to the counter while I had the car overdue and wanted a sedan, and they also have to prove they don't have a lot full of sedans to fulfill that demand. Could they charge you the rent for that additional lease? If the contract provided for it, yes. But that's a separate issue, right? If you're just looking at the question of direct and consequential damages, right, the restatement says that unless you prove the lost profits in the fashion I just described, then their remedy is to replace the property, right, or to repair it if it's damaged. Here do we have a situation where the damages were the rental fee they lost during the time period that your client had the property? Not so much that they could have leased it to someone else, but they kept it and they owe us rent for those days they kept it, and that's the damages that were assessed by the trial court. So the answer is no, that's not a valid way to assess the damages. Let me divide it into two periods. You have the six-month period where we actually agreed to rent the property. That's the six months that the contract covers, and we do owe those damages. That's the actual damages of $53,000. But after six months, there is no contract, right? That's this false idea that really what this is is a conversion, a theft, and if I take your stuff, the law doesn't create a new contract and extend it perpetuity, right? It's conversion. It's theft. And that's not just our position. That's the position that the plaintiff took, which is to say after the original six-month period, the contract was over. If you want to see that in the findings and conclusions that they asked for and got, you can see it in conclusion number four, where they say that after the term of the lease, the contract was terminated. That's at page 994 of the record. And so the way the law deals with this is if I don't give your stuff back, then you have a cause of action for taking it. The doesn't impose a contract. Now, there are also two other problems with this argument about a contract-based basis for the damages. And one of them is that the only provision they've pointed to in the contract is a provision that refers to damaged equipment. And as you know to Judge South, that we have four systems here, and only one of them was damaged. So that couldn't solve for the $800,000 of damages here. And the other problem is that if you look at this clause, it's a liquidated damages clause. It's not enforceable. And the reason it's not enforceable is because this kind of penalty, the idea that you pay the day rate every day, 24-7, 365, isn't actually a reasonable forecast of just compensation. I mean, if you really think about this, if they're making the kind of profit they say they're making every single day, I think we're all in the wrong business. But they relied on your client to report when the equipment was being in use. That's right, Your Honor. That's a point in our favor, not theirs, because their damages theory assumes that we pay for every day no matter what. But the only proof in the record says that under the contract we had, if we had the equipment— Well, there was evidence that the equipment was in use during days when you didn't report that it was. Isn't that correct? There is, Your Honor, but we don't think that passes the threshold Texas law imposes, right? If this is a lost certainty. It's okay for me to deceive them, but they still have to prove that they weren't deceived every day. If they wanted to make a burden-shifting argument, I think they could, Your Honor. But again, that doesn't solve for the idea that the contract doesn't apply past the six months, right? And it also— What amount do you agree is appropriate for the six months? After six months? So other than actual damages, we think they're entitled to zero, because they didn't prove that they had other deals to devote this equipment to, that they had other demand. So they actually suffered no harm, right? They're trying to get the benefit of a bargain that we never made. We never contracted for to pay them this money past six months. We just essentially took their stuff. It would be as though after six months, you could treat the case as though we took the property, we just robbed it, as though the first contract never occurred. In that situation, you wouldn't impose a new contract that was never made. You would ask, well, they took the property from me. What loss did that cause? And so that's the fundamental problem here, is that for both the fraud cause of action and the breach of contract action, what the plaintiff has done is sort of assumed that they could have devoted the property to other business, but they never actually proved this. One reason it seems to me this is not a conversion action for that period after six months is the continuing assertions by your client that it's on its way. And delaying purchasing of alternative equipment made sense for some period of time. How long that made sense is sort of a fact question. So it's not just a matter of six months was the only length of the contract. You kept them from leasing this other equipment. If we had now stolen your property, move on. That would have been one thing, but that's not what your client did. Well, Your Honor, the argument you just gave is an argument for— The question, I think, presupposes a detrimental reliance. That is evidence that because we were telling them what we told them, they didn't go out and replace the equipment for some period of time. And because they didn't have the equipment, they weren't able to satisfy some demand. There may be reliance here, but it's not detrimental reliance unless they prove that they couldn't carry on their business, and they didn't give that kind of proof. Remember, we have the evidence from Mr. McCullough. He's the general counsel, and he says that almost from the very beginning, he didn't believe them when they were saying we're about to bring the equipment back, right? And so we've advanced this as an independent argument that they knew the truth. At the very least, it disproves detrimental reliance. That's the, you knew I was lying to you, so you're not entitled to any damage. That's right, Your Honor. That's right. It's the plaintiff's burden to prove detrimental reliance. That's the law, and they don't have any proof of it. I think it would have been easy for them. The burden here would be quite low to ask them, because they lied to you, did you not replace the equipment, or did you, you know, not get new equipment to rent out? And they just didn't ask that question. Wasn't there something from Mr. Pena that said that they could have leased the equipment to the U.S. with some, no problem, they could have leased it? So that's the quotation, Your Honor, that I gave you on 1165. The question is, you could have leased, let's see, all of this equipment was equipment which you could have leased had it been back in the United States. If I can draw you back to the rental car analogy, that's like saying I could have leased you the car that wasn't brought back. But it's also true, I could have had a lot full of other cars, and it wasn't actually a problem. I could have leased you this car, I could have leased you one of the ten other cars, right? If they're going to prove a lost profits model, Texas law says there has to be reasonable certainty, and the plaintiff has the burden of proving one complete calculation that hits each of the elements. And I want to emphasize that I think the plaintiff, and they can clarify in a minute, I think they've abandoned this idea. I don't think they're saying that they proved a lost profits model. I think they're saying they proved some other type of damage model. And if that's the case, we think it's essentially over. I think they're resting it really on this provision about damaged equipment, which, as we say, has the three problems. So I think it's important to get maybe a clear answer in my friend's presentation about what exactly the model is, because I don't think their position is that they proved what Texas requires of lost profits that is sort of assumed by the Court's questions. The last thing that I anticipate my friend might talk about is what we were doing with the equipment and the idea that while we said we were going to give it back, in fact, we were putting it to our uses in the water. That might give rise to some sort of— At what point they should have stopped believing your client and then calculate damages from the point that it was—that you determined. That's right. The first time they lie and say I'm sending it back. Maybe you believe that. So at some point, though, you've got to determine they're lying. That's right, Your Honor. If they had damages occurring, which we say they didn't, but if they did, then there would need to be a finding that said— And then what law says I have an obligation to mitigate my damages by spending money. I have to go out and buy more equipment to rent, and that mitigates my damages. Well, it depends on which— And I have an obligation under the law to do that, to mitigate damages. The contract action, you definitely do, Your Honor. That's Restatement Section 350 we've given you that says—the illustration we've given you is perfectly applicable to machinery used to make income. That says you have an obligation to buy a new piece of machinery. Now, I don't want to answer for the fraud action. I don't think there's a mitigation requirement, and so the law is a little bit different there. But for the fraud action, you need to show continually reasonable reliance. And so there would need to be a finding of time. Thank you. Mr. Borges, you've saved some time for rebuttal. Mr. Wise? Good morning, Your Honors. John Wise here, along Lauren Guichard on behalf of Form Sub C. Your Honors, I would like to start with specific jurisdiction first. I see my counsel kind of glossed over that, and I'm sure there's a reason why he did, which is that I don't think this Court really needs to go any further than a minimum contacts analysis to determine that there is an ample basis for jurisdiction. They devoted a lot of time in their brief—it seems to me disproportionate amount of their brief and their reply brief—to the issue of minimum contacts, and they cited the Walden case as somehow being relevant to that, to their side of the case. But to me, the issue of minimum contacts has been more or less evolving the same way since I was in law school back in the early 1980s, and we were learning about International Shoe and Schaefer v. Heitner, and then while I was there, I think Worldwide Volkswagen came out, and now we're at Walden. But the test is basically the same. It's purposeful availment of the forum by the defendant, and we're not contesting that. What we're saying is that ample contacts exist, and to summarize what we've said about that, the defendants initiated contact in the State of Texas. They started off asking for a meeting with our client, which at that time, by the way, was DPS. It wasn't Forum Subsea. It was a smaller company that Forum eventually acquired. They asked to do business with DPS. They wanted to get equipment shipped down into the Bay of Campeche, Mexican Gulf of Mexico, and this is pretty much the area of the U.S. Gulf and the Mexican Gulf where DPS was doing business. They sought this contact. They twice applied for a credit application so that they would get their credit approved and they would be able to do They followed that up with attending personally a meeting where Mr. Elshari shows up, I think, with his father, and they have discussions about what this relationship is going to be like, and the expectation is there's going to be a relationship, and that is further proved by the fact that for this first six-month period of rental, my client basically gave them an accommodation, something that they wouldn't necessarily do with most other clients because these guys were starting out and wanted to build this relationship, so what they did was they gave them the right to only charge for the days of rental during this first six-month period that they had the equipment. That's not a money-making proposition over a long period of time for my client, but it was a way to get these people involved in a relationship, and for the jurisdictional purposes, it contemplates that they intended to have a relationship and that that relationship was going to go over time, and in furtherance of that their operation was, not once but several times, they shipped equipment back for repairs to Texas. They continued a relationship with Texas, and I think the case that we cited that really is on all four square with this case would be that Central Freight Lines case from the Fifth Circuit back in, I guess, 2002, where there was a freight line where they were doing business on the East Coast, but people from the East Coast came to Texas and had a visit to start this relationship, and the relationship continued and was ongoing. They had an expectation of being hailed into court there for breaching that agreement. That's exactly what we've got here. The defendants in this case certainly had an expectation to be here. There's no question about that. So I think right off the bat you can stop with minimum context and say that we if we needed to talk any further, we also have this interesting issue of waiver that existed, and the waiver kind of goes to a lot of things, including their conduct in this case, which was basically to drag this out as far as they could and then not show up for trial at the last minute, and I mean that to me is the quintessential definition of sandbagging on a lot of levels, but it certainly was sandbagging as respects the personal jurisdiction issue, and you heard opposing counsel say at the very beginning he was I think my note said he referenced our response to the quote motion to dismiss of the defendants. In the briefs they've also done this, and they try to lump all the defendants together, but that's not what was going on in the course of this case. What they originally did is they filed an answer where they included the stock personal jurisdiction, subject matter jurisdiction, whatever, all in the answer, and then it goes away completely for Global Tech. Global Tech, they never mentioned Global Tech again, and the reason that they did that, I believe, is that they were trying to get the Mr. and Mrs. Elshary out of the case on personal jurisdiction, and they didn't care what happened to Global Tech. They were fine with the judgment being taken against them. Well, that backfired on them because we took a deposition of Mr. Elshary in March of 2014, and he pierced the corporate veil. They know that these people did not observe corporate formalities, so now the situation has radically changed. They still filed their motion to dismiss for lack of personal jurisdiction for themselves, not for Global Tech. They had the opportunity to do that. Didn't do it. Judge Hittner denies that, and then, of course, what happens a few days later is the equipment shows up after three years. The next last gasp effort to avoid going to trial, they bring the equipment two years and nine months or whatever. Miraculously, it shows up. It shows up at their lawyer's office in Houston, and I receive a phone call, and I'm asked, well, would you like to take a look at this equipment and see if it's your client's? Well, where did it come from? Oh, we don't know. You know, you can come look at it, though. That's how it arrived. I say this because, again, there's no effort to try to preserve any kind of defense for Global Tech. Now we're just in a glide path towards this trial, which ultimately results five days before trial in the plaintiff, excuse me, the defendant, and Mr. El-Shawari, Mrs. El-Shawari, and Global Tech's counsel. Five days before trial. So we basically have to proceed with the trial without anybody being there. There's no effort made to raise Global Tech's lack of personal jurisdiction by any kind of motion. They don't come to trial to cross-examine that issue. They do nothing to do it. And then what happens after the trial is over with, after they fired their counsel because they couldn't afford counsel, they hired new counsel. And new counsel comes in and files a motion for new trial, and he couples it with a counterclaim that he asked the court to be allowed to file. Now, putting aside the wisdom of doing that after you've just been hit with a million dollar judgment, the fact of the matter is that is now getting into this area of asking for affirmative relief. And that's exactly what they did. They didn't have to do that. They asked for their counsel to be allowed to file a motion, and that's exactly what they did, and that's exactly what they did. And I don't think you need to reach it because I think it's minimum context, but I don't think this Court ought to countenance this type of behavior, which is obviously doing nothing but manipulating the actions at the district court level for their own convenience, which is exactly what they did. Having run their gamut out, that's pretty much what occurred. Mr. Wise, with regard to damages, do you see this as a fraud situation that required detrimental reliance? Well, it is certainly we pled fraud, and fraud, detrimental reliance is a component of fraud. I mean, the four things, material misrepresentation, the defendant has to know it was false, it's made with the intent that the plaintiff would act on it. They haven't contested any of those, but they have contested detrimental reliance. Well, let's start talking about detrimental reliance because the central point here is that we sent this equipment to Mexico to a place where realistically it's difficult to retrieve it if somebody wants to steal it or wants to not return it, and what they essentially did is we relied on a representation that we're going to send this equipment back to you in six months. They didn't send the equipment back to them in six months. We actually know now through discovery, through expensive discovery, I might add, because we had to translate those Mexican customs documents, I think, for about $10,000, those all in Spanish, and we learned that they actually, while they were telling us that they intended to return it, that they actually intended to permanently import it, and so what is the reliance? Well, the reliance is we would, first of all, first and foremost, is we wouldn't have sent it down there if we knew they were going to steal it. But once it's sent down there and they've kept it, how did, what was the detrimental reliance in this case? They represented they were going to rent it for six months and they kept it longer than that. What did you rely on that caused you to lose some money or profits? Well, there's several things that happened in terms of reliance. I mean, Mr. McCulloch testified, and this wasn't mentioned by opposing counsel, but Mr. McCulloch, who is the general counsel for Forum Subsea, and he was the general counsel for Global Santa Fe for about 30 years before he took that job, and he basically explained that by not returning the equipment that now has the patina of a customs issue in Mexico, because it's been there for more than six months, any kind of return, especially the way it was returned, which is returned with no questions asked, here it is in an office, we don't have any way of knowing at this stage of the game whether or not that was illegally taken out of Mexico, whether any customs were paid, what the situation is, and the damage there that occurs from that is the fact that now you can't send it back and deploy it in Mexico. So they've lost the market for that piece of equipment for a good bit of their business. Now it can only be used in the U.S. Gulf of Mexico, because if you send it back to Mexico with those serial numbers, it could be seized. You could be liable for some type of illegal importation. So he caused that problem himself by his behavior. That's future rental of that equipment. Correct. What representations did they make to you that caused you to lose money while they had custody of the equipment? Well, by saying repeatedly for a course of over a year, it's about to come back, they used different excuses for why it didn't come back. You know, we have to pay a VAT tax, you know, we need a certificate of origin, you know, we've got it all lined up here, we're negotiating with Mexican customs. All of those were lies, and the net result was we didn't do anything or take any action to go buy any other equipment during that period. And as you heard, as you noted before, Mr. Pena testified that this was a good market in 2012 and 2013. They could have rented that equipment easily and they didn't go and purchase new equipment because they were good people and they believed in the integrity, at least for a while, of these individuals they were doing business with. Well, the argument from opposing counsel on detrimental reliance, that the evidence is just too thin here, that there's no direct evidence of what the market was, of possible other rentals, of how much of similar equipment you had, whether it was fully rented. Is the only evidence of the potential rental what he quoted to us from where you're standing? Yes, as far as what they knew at the time, that's correct. I mean, this is not a huge company and the way that they make their money is they get calls and phone calls or they have a salesman who's going around trying to drum up business for rentals. It would be a very difficult undertaking to try to figure out what your overall company forecast for renting this equipment was going to be for two or three years into the future. That's part of it. There was also the issue of whether, in fact, you needed this equipment or whether you had other equipment that could have satisfied, similar equipment that could have satisfied these orders. It seems to me, regardless of the difficulties, we are looking at whether there's enough evidence in the record to support the damages that were awarded. What other evidence can you point us to other than what your friend on the other side told us? Well, and now we're kind of grading into the loss of use damages, but before we leave the topic of fraud, and I'll tell you why fraud matters in this case to us. Fraud doesn't increase the damages in terms of we have breach of contract. Breach of contract gets you attorney's fees and taxes. Fraud is here for the purposes of establishing that it's non-dischargeable in this case. And so I think it is very important, and I think that's why they're fighting it so hard. And so I would say that there is certainly reliance here. I don't think you have to have a whole lot of reliance, but I think if you have an expectation someone's going to bring it back to you and you've put your operation on hold and you're not filing a lawsuit against them and you're not buying new equipment, then you've relied on their integrity to bring you that equipment back. So I think that's important here. But you don't have to rely to your detriment, which is my question that you have . . . and I'll write for you to say I'll wait on answering, but it seems to me my question does go to detrimental reliance. What evidence is there of the detriment to you by showing lost orders, didn't have any more equipment like this, other questions, other facts that would have supported that you . . . Well, the answer to that is . . . and we're talking now about the loss of use is the daily rate. And Mr. McCulloch testified, and I didn't . . . I noticed I didn't include that in my brief, which was not good. But if you look at finding a fact number four, Judge Hittner does address it, and it's contained on page 85 of the transcript. Mr. McCulloch basically says, again, in the course of 35-odd years of being a general counsel and dealing with these issues, that a custom in the industry is basically when you bring something back late, whether it be a crew boat or whether it be a generator or whether it be a drilling rig, once it's off hire and you don't bring it back on time, you pay a daily rate until it's returned. And that was the expectation that DPS and then Forum Subsea had with regard to this equipment. So are damages in this case rent you could have collected by renting this equipment to someone else and therefore you relied on their representation that we're going to give it back to you, you didn't go buy new equipment to rent to someone else, are damages rent they should have been paying while they had kept the equipment and so you're collecting rent while they used the equipment or had the equipment? Which are the damages here? That's a really good question, Your Honor, and it's both. Because you can look at this from both sides of the issue. On the one hand, we have what could we do with the equipment if it had been returned? Well, Mr. Pena said there was a good market and he would have been out trying to deploy it and rent it. On the other hand, they kept it. And what we now know, what we didn't know until it returned with smelling of the ocean and having marine growth on the product when we opened the boxes at their lawyer's office, what we now know is they were using it. And so the whole relationship here of between DPS and Global Tech is that Global Tech rents equipment at a daily rate and then they deploy it and they get a daily rate plus whatever they've marked it up to their customer. So let's say they pay Global Tech $500 a day for a day that it's used and they make $300 a day or whatever number that they mark it up, then now by just keeping the equipment, they've benefited from this whole situation and they've now had it for two years and nine months. And we know they were using it all the way up to probably a month before this equipment comes back. But what damages did the judge give? Did he give the damages under the theory that there was reliance on your part and that you could have rented it to someone else or over rent not paid while they kept the equipment? Well, I think he understood that from what Mr. Pena said was that we could have made money by the use of this equipment. But I think it's equally true to say that they obtained that profit instead and that's the whole fraud component of this thing. They took it with an intent to keep it permanently and they went and made the money that would have otherwise been made by DPS. Now opposing counsel gave us this hypothetical about a car rental that if you keep the car beyond the time period you rented it for, they can't continue to charge you rent on those days. Is that applicable here or why is it not applicable here? I don't think so because, you know, he didn't include in his hypothet that you did it deliberately with the intent to take it forever. I mean, the simple facts of the matter are we'd have never seen any of this equipment back in Houston, Texas until they lost that motion to dismiss individually. They knew they were facing a day of reckoning in August and the very first thing they did within a day is he went and ordered up that equipment that he somehow couldn't, you know, extract from Mexico. I mean, he literally did that. The record establishes that. You know, that to me tells me that equipment was never coming back. He took it with the intent to keep it permanently and in fact he got away with it partially because some of it's still there. It never showed up. So, you know, to me, I mean, there's no question here that he was using it, he was making money off of it and he's and he would have continued to do that merrily if things hadn't gone the wrong way here and on the personal jurisdiction issue. Was the primary authority counsel for the proposition that it was appropriate for the district court to determine that the calculation for damages was a day for day, every day during the period that they had this equipment, a day for day calculation that they ought to have? Well, I think what I said earlier about what Mr. McCulloch testified to that it was customary in the industry was a basis for it. It certainly was relied upon by the judge in his findings of fact. And absent any, I mean, a judge is free to calculate damages to a degree. He's got some latitude in doing it. And I guess the question is, is how would you fashion damages otherwise in the situation where you know that it was being wrongfully kept, you know it was being used? And this gets back to their failure to attend trial. A lot of the things that counsel are saying here today are very interesting issues which could have been raised on cross-examination. But they deliberately boycotted the trial with the hope, I suppose, that you know they wouldn't get hit for very much and then it would only be global tech and they would just try to avoid any responsibility. And now they're trying to raise all these issues by appellate brief and they're raising fact issues. And you can't really do that. The facts are the facts. And I think they establish enough to show that Judge Hittner was correct in making an award. And I see I'm out of time. Thank you, Mr. Wise. Thank you, Your Honor. When I said that we don't want to give personal jurisdiction short shrift, I meant it. We really do have a full press argument about personal jurisdiction. Let me say two things about that. First of all, on the merits, he says their best case is the Central Freight Lines case. I'll give you the two cases that we think beat it. Moncrief and Walden. Because Moncrief on page 313 turns on the following conclusion, that there was, quote, no indication that the location of the performance mattered. That's our argument here. That these defendants didn't care where the defendant was coming from or having to be sent back. And that gets reaffirmed in Walden, right? Page 1125, that's a failure to return property case. And the court decides it because, quote, that the failure to return the property is not the sort of effect that is tethered to the forum in any meaningful way. Now, I think the court can read those cases for itself, and so I don't want to just recite them back. But let's be clear about we think it's a very close case on jurisdiction and that Walden and Moncrief are the two decisions that we think prevent the court from affirming. Now, on the waiver question, you heard a suggestion that we only preserved the question of personal jurisdiction for the individuals and not the company. But that's wrong, and I can disprove it quickly. The answer denied personal jurisdiction as to both the individuals and the company. I think my friend agrees to that. The motion to dismiss did so as well. If you look at page 367 of the record, that's the motion to dismiss that was filed by the individual defendants. And it says, specific jurisdiction over global tech, however, is probably a factual issue intertwined with the merits. So the motion to dismiss didn't lay over for global tech. And the last preservation citation I have for you is page 781 of the record. That's a pretrial proposed findings and conclusions from our side. And before trial, we tell the court, you should find the following. Neither global tech nor Mr. or Mrs. Alshari have minimum contacts with Texas sufficient to subject any or all of them to jurisdiction in Texas. The jurisdictional issue is preserved, and the court needs to decide it before it goes to the merits. Now to damages. I think that I've counted four arguments about the reliance and damage that the plaintiffs say they'd suffered, and I think I can dispense with them. The first thing they said is that if we hadn't lied to them, they wouldn't have sent us the equipment in the first place. Well, that can't be a fraud action, because that's the contract action. Remember, that's the original promise that we'll pay you to send us the property. That can't be detrimental reliance for fraud. That's the breach of contract action. The second thing he says is he talks about a customs issue, that because we kept the property too long and then sent it back, it couldn't have been used in Mexico. That's not part of detrimental reliance, because that doesn't have anything to do with the misrepresentation we made. It's our conduct. We kept the stuff too long. That may have made the property less profitable later, but it doesn't have anything to do with the misrepresentation and them changing what they did. We took something from them, and maybe we gave it back damaged or hurt, but they still haven't shown that their conduct changed. The third thing we have is this idea about custom in the industry, that because in other contracts other parties decide to set some level of damages, that these parties somehow did so. That's not how contract interpretation works, right? This agreement only covers the six months of this rental period. But if it's the custom and usage in the industry, which I took to be his point, I'm not sure what evidence there is. Maybe Mr. McCulloch testified as to that. Is there testimony that it is the custom and usage of the industry? There is, Your Honor, but there's no contract provision to attach it to. So this is a UCC case. It's a UCC Article II lease case. You could use custom to interpret some part of the contract if you thought it was ambiguous, but here there's no provision. The contract ends after six months. We have one provision about damaged equipment, but I've told you why that doesn't work, because not all the equipment was damaged. And so the idea that sometimes in other deals people pay X level of damages doesn't inform this contract. I don't think that argument was pressed below, and it certainly wasn't pressed in the briefs, but I don't think it solves the case. Well, is it a proper way for the district court to determine damages by determining what the rent would have been they would have collected from you for keeping this contract? It's not, Your Honor, because that buys into the idea that once the contract is over, the remedy is to keep imposing the contract. But we didn't agree to anything more than six months. It's the idea that in a conversion case, which I think this really is, courts don't create a contract and impose it in perpetuity. What you do is use the common law of damages and say what lost profits were there, and if there weren't lost profits proven, then you get the replacement value. That's Restatement Section 350. We've quoted you the illustration in our brief that speaks specifically to property machines that are used to make profit. The case really does rise or fall on page 1165. It's the Pena testimony that I quoted to you. If you think that proves lost profits, then I think they get their damages. But that's really the only evidence of not being able to have the demand and supply that they need. Thank you. Thank you. Thank you, both.